**In re Ocie Gene DeVOLL, Debtor.**

**Bill McClendon, Plaintiff,**

v.

**Ocie Gene DeVoll, Defendant.**

**Bankruptcy No. 99–46610–BJH–7.**
**Adversary No. 00–4102.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Aug. 22, 2001.

Blue W. Rannefeld, Law Offices of Blue W. Rannefeld, Ft. Worth, TX, Counsel for Ocie Gene DeVoll.

Frederic M. Wolfram, Wolfram Law Firm, Amarillo, TX, Counsel for Bill McClendon.

### *MEMORANDUM OPINION*

BARBARA J. HOUSER, Bankruptcy Judge.

This Complaint to Determine Dischargeability of Debt and to Deny Debtor a Discharge (the "Complaint") was tried on July 12, 2001. At the conclusion of the trial, and at the request of the parties, the Court accepted post-trial briefs from the Plaintiff Bill McClendon ("Plaintiff") on July 26, 2001 and from Debtor/Defendant Ocie Gene DeVoll ("Debtor" or "Defendant") on August 2, 2001. After reviewing the evidence admitted at trial and the arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable here by Federal Rule of Bankruptcy Procedure 7052.

## I. FACTUAL BACKGROUND

### A. The Underlying Judgment

Prior to filing for protection under the Bankruptcy Code, Debtor and Plaintiff en-

tered into a business transaction pursuant to which Debtor financed Plaintiff's used car business. During the course of this business transaction, Debtor declared Plaintiff to be in default and repossessed Plaintiff's inventory. Subsequently, Plaintiff filed a lawsuit against Debtor in Texas state court alleging conversion, economic duress, deceptive trade practices, and usury, which resulted in a jury verdict against Debtor (the "Conversion Lawsuit"). *See* Plaintiff's Exhibit 1. As relevant here, the jury found that Debtor "converted the personal property of the plaintiff, in a manner which was the proximate cause of damages to the plaintiff," *see id.*, Question No.1, and that the "conduct of the [Debtor] in converting plaintiff's property, [was] done willfully, maliciously, or with reckless disregard to the rights of the plaintiff." *See id.*, Question No. 3. The jury's verdict was reduced to a judgment (the "Judgment") on August 27, 1993. *See* Plaintiff's Exhibit 2. No appeal was taken from the Judgment.

### B. Debtor's Bankruptcy Case

Debtor filed his chapter 11 case on December 20, 1999. At that time, Debtor's section 341 meeting was set for February 2, 2000. *See* Notice of Commencement of Case Under Bankruptcy Code Chapter 11, Meeting of Creditors, and Fixing of Dates. Debtor filed his chapter 11 schedules and statement of financial affairs on December 22, 1999. *See* Plaintiff's Exhibit 3.[1]

On January 5, 2000, prior to the scheduled section 341 meeting, Debtor filed a motion to convert his case to a case under

---

1. The copies of Debtor's various sets of Schedules and Statements of Financial Affairs and Rule 1019 Schedule of Unpaid Debts offered by Plaintiff as Plaintiff's Exhibits 3–6 contained handwritten notes made by counsel for Plaintiff. Debtor's counsel objected to the admission of Exhibits 3–6 due to the hand- written notes. The Court sustained the objection in part, ruling that the handwritten notes were not part of the record. The Court also takes judicial notice of the "clean copies" of Plaintiff's Exhibits 3–6 contained in the Court's file. *See* Fed.R.Evid. 201.

chapter 13, and an order granting that motion was entered on January 13, 2000. *See* Order To Convert Case. Debtor filed his chapter 13 schedules and statement of financial affairs on January 19, 2000. *See* Plaintiff's Exhibit 4.

On March 7, 2000, the standing chapter 13 trustee convened and presided over Debtor's section 341 meeting. *See* Report of (Adjourned) 341 Meeting. On March 10, 2000, Plaintiff filed a motion to dismiss Debtor's bankruptcy case. Debtor opposed that motion, and on March 14, 2000 filed a motion to re-convert the case to a case under chapter 11. At the hearing on Plaintiff's motion to dismiss and Debtor's motion to convert, the parties announced that they would submit an agreed order re-converting the case to one under chapter 11, and an agreed order consistent with that announcement was entered on May 19, 2000. *See* Agreed Order on Motion to Dismiss by Bill McClendon and Motion to Convert by Debtor. Debtor's section 341 meeting was set for June 28, 2000. *See* Notice of Commencement of Case Under Bankruptcy Code Chapter 11, Meeting of Creditors, and Fixing of Dates. Debtor filed his second set of chapter 11 schedules and statement of financial affairs on May 22, 2000. *See* Plaintiff's Exhibit 5.

On September 7, 2000, Plaintiff filed another motion to dismiss Debtor's bankruptcy case. *See* Motion to Dismiss Under §§ 305 and 1112(b) of the Bankruptcy Code and Because the Bankruptcy was Filed in Bad Faith. On September 12, 2000, Debtor responded to the second motion to dismiss, and requested that the Court alternatively consider converting the case to one under chapter 7. *See* Answer to Motion Filed by Bill McClendon to Dismiss and Alternatively, Motion to Convert to Chapter 7. On October 27, 2000, Plaintiff filed a motion to compromise certain outstanding matters with Debtor, including Plaintiff's motion to dismiss. A part of this proposed compromise required Debtor to convert his case to one under chapter 7. *See* Motion to Approve Settlement. On November 13, 2000, the Court entered an order converting the case to one under chapter 7. *See* Order Approving Settlement and Converting Case to Chapter 7. Debtor's section 341 meeting was reset to December 18, 2000. *See* Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines. Debtor filed his Bankruptcy Rule 1019 Schedule of Unpaid Debt Incurred After Filing Petition and Before Conversion on November 28, 2000. *See* Plaintiff's Exhibit 6.

## C. Certain Pre- and Post–Petition Activities and Disclosures of Debtor

### 1. Pennie Mac, Inc.

Debtor is the registered agent and an officer (Secretary) of a Texas corporation named Pennie Mac, Inc. ("Pennie Mac"). *See* Plaintiff's Exhibit 9, *see also* Plaintiff's Exhibit 18, pp. 32, 36. Debtor testified that he incorporated Pennie Mac with cash provided by an individual named Randy Dawson, and that after its incorporation, Pennie Mac had not issued any shares of stock, held any meetings, named any other officers, and had no assets. *See* Plaintiff's Exhibit 18, pp. 32, 36. Debtor did not disclose his relationship or involvement with Pennie Mac in any of his schedules or statements of financial affairs. *See* Plaintiff's Exhibits 3–5.

Although Debtor testified that Pennie Mac had no assets, *see* Plaintiff's Exhibit 18, p. 32, he later testified that Pennie Mac was involved in a transaction with another entity Debtor did business with, T & C

Trust.[2] *See id.* at p. 34. Debtor further testified that T & C Trust owned a judgment against Tommy Denbow that was released, with Pennie Mac signing for T & C Trust and Debtor signing for Pennie Mac. *See id* at pp. 34–35. Although this transaction occurred in June 2000 (some two months or so prior to his third scheduled section 341 meeting and examination), Debtor could not recall the details of the transaction—including such details as how much money Denbow paid to have the lien on his property released and where that money then was. *See id.* at pp. 34–35. Debtor testified that Denbow may have

paid in cash to have the lien released, that the cash was "possibly" placed in a drawer at Debtor's home, and that the drawer was "perhaps" in Debtor's bedroom.[3] *See id.* at pp. 34–38.

### 2. Lincoln Financial

Debtor did not disclose his relationship or involvement with two entities, each of which is apparently named Lincoln Financial, in any of his schedules or statements of financial affairs. *See* Plaintiff's Exhibits 3–5. At a reconvened section 341 meeting, Debtor testified that he had a number of business dealings with an entity known as

2. T & C Trust will be discussed in more detail. *See* pp. 87–89, *infra*.

3. Because this testimony is fairly typical of Debtor's answers to his creditors' inquiries, it will be quoted in relevant part.

Q. What is the history of this judgment [the Denbow judgment]?
A. The lien was released. T & C Trust released the lien.
Q. Who signed for T & C Trust?
A. Penny Mac [sic] and I signed for Penny Mack [sic].
Q. Did you acquire this loan—this lien, judgment lien?
A. I did not.
Q. Did you ever deal with Tommy Denbow?
A. Only as releasing the lien for Penny Mack [sic].
Q. How pay much did he [Denbow] pay for release of lien?
A. I don't recall, Steve.
Q. This is June of 2000, basically two months—two and a half months ago, sir. Was it more than a thousand or less than a thousand.
A. I don't recall. I've answered that.
Q. If I asked Tommy Denbow if . . . he delivered something to you—what would he say?
A. I collected for T & C Trust with a judgment and signed a release for Penny Mack [sic].
Q. But he did place money in your hand, by check or otherwise?
A. Yes, he settled with this judgment.
Q. And you don't recall if it was more than $1,000 or less than $1,000?

A. I don't recall.
Q. Was it more than $10,000?
A. I don't recall.
Q. What did you do with the cash or check that you received in your hand physically?
A. It would have been forwarded to T & C Trust.
Q. Where did you—who did you forward it to there at T & C Trust?
A. Well, I haven't paid them yet.
Q. Who—Do you still hold the money?
A. Yes.
Q. How much money do you hold for T & C Trust?
A. I don't know.
Q. You don't know how much money you hold for T & C Trust?
A. No sir.
Q. Where is the money? Is it in a bank account?
A. No, I don't have a bank account. It's just cash.
Q. Cash in your drawer?
A. Possibly so.
Q. You don't remember where you keep your cash?
A. No sir.
Q. And you—you hold cash, but you're not sure where it is? In a—in a drawer in your—in your bedroom perhaps?
A. Perhaps.
Q. Would you be willing to tell the trustee where you hold this money?
A. I just haven't forwarded it to them [T & C Trust], and I don't know that it's all been collected yet, but the judgment was released by Penny Mack [sic].

Lincoln Financial over a period of years. *See* Plaintiff's Exhibit 18, p. 46. Debtor testified that this Lincoln Financial operated out of south Texas (he could not remember where specifically) and that the person he dealt with there was Steve Boone. *See id.* at p. 42. Debtor could not remember Boone's telephone number, the area code for his telephone number, or his address. *See id.* Debtor further testified that he bought notes from, and sold notes to, this Lincoln Financial, *see id.* at p. 41; specifically including the Kelly Behn note and the William Stanley note,[4] which were sold to Lincoln Financial in September or October of 2000 for $2,000.00 cash.[5] *See id.* at p. 43. Debtor testified that this cash was kept in a drawer at his home for some period of time before he claims to have deposited it in the DIP account.[6] *See id.* at p. 45. However, at a Rule 2004 examination conducted later, Debtor denied having engaged in any cash transactions in the year 2000. *See* Plaintiff's Exhibit 19, p. 30 ("Q. In the year 2000, did you engage in any of your business transactions, buying and selling of judgments and liens and mortgages in cash transactions? A. No.").

Debtor also testified that he had an interest in a judgment against a different entity also called Lincoln Financial ("Lincoln ·Financial II") with a face value of over $300,000 (the "Lincoln Financial II Judgment"). *See id.* at pp. 48–49. Debtor did not disclose his interest in the Lincoln Financial II Judgment on any of his schedules or statements of financial affairs. *See* Plaintiff's Exhibits 3–5. Debtor testified that the officer of Lincoln Financial II that he dealt with was Randy Dawson. *See* Plaintiff's Exhibit 19, p. 28.

At a Rule 2004 examination conducted later, Debtor provided conflicting sworn testimony regarding whether he was aware of two entities known as Lincoln Financial, initially testifying at his reconvened section 341 meeting that there were two entities called Lincoln Financial, but later testifying that Lincoln Financial II was the only Lincoln Financial of which he was aware. *Compare* Plaintiff's Exhibit 18, p. 48 ("Q. How many Lincoln Financials are there? A. Well, there are two that I know of."), *with* Plaintiff's Exhibit 19, p. 28 ("Q. Do you know—is that the only Lincoln Financial company that you know of? A. Yes.").

### 3. T & C Trust

Debtor testified at his reconvened section 341 meeting that T & C Trust is an entity based in Mexico City. *See* Plaintiff's Exhibit 18, p. 39. However, at the trial on the Complaint, Debtor testified that T & C

---

*See* Plaintiff's Exhibit 18, pp. 34–38.

**4.** Although Debtor's involvement with some judgments, liens and notes occurred post-petition and Debtor contends that his interest in those post-petition instruments represents earnings from his personal services that are not property of the estate under section 541(a)(6), Debtor agrees that these notes are property of the estate. These notes were identified on Debtor's schedules as receivables owed to Debtor. *See* Plaintiff's Exhibit 3.

**5.** Debtor initially testified that he did not "remember how he [Steve Boone] got the cash to me." *See* Plaintiff's Exhibit 18, p. 43. However, after further questioning, Debtor admitted that Steve Boone had hand delivered the cash to him. *See id.*

**6.** Plaintiff contends that not all of the monies Debtor collected on notes and other instruments that are property of the estate were deposited in the DIP account. On this record, the Court cannot tell if all monies are properly accounted for. Because Debtor claims to have turned over all bank statements and supporting detail to the Office of the United States Trustee (*see, e.g.* Plaintiff's Exhibit 19, pp. 10, 14–15, 25, 74–75), which the trustee's office denies ever receiving (*see* Plaintiff's Exhibit 22), it is not possible to determine if the monies were actually deposited.

Trust was, in fact, based in Laredo. Debtor did not disclose any relationship with T & C Trust in any of his schedules or statements of financial affairs. *See* Plaintiff's Exhibits 3–5.

As noted previously, Debtor testified that he held cash assets of T & C Trust at his house (at least the Denbow judgment proceeds discussed at p. 86, *supra*). However, Debtor did not disclose that he held assets for another in response to question 14 on any of his statements of financial affairs. *See* Plaintiff's Exhibits 3–5. As noted previously, Debtor later contradicted his testimony about these cash transactions, testifying instead that he had not engaged in any cash transactions for a period of two years. *See* Plaintiff's Exhibit 19, pp. 29–30; *see also* p. 87, *supra*.

Debtor's precise relationship with T & C Trust is unclear on this record. Debtor testified at a reconvened section 341 meeting about that relationship as follows:

Q. And you have to send money to T & C Trust; is that correct? Where are they out of?

A. Mexico City.

7. *Just a few pages earlier in the transcript, Debtor had testified as follows:*
Q. T & C Trust, what is that?
A. It's a trust that I've done some business with that I've been as [sic] an agent for.
Q. Who is the owner of the trust?
A. I don't know.
Q. Is it anybody in your family?
A. No. I don't know who owns the trust....
Q. Who hired you as the agent of T & C Trust?
A. I actually wasn't hired as an agent. I just have acted as an agent on a transaction or two, I believe was your question.
Q. Who requested that you act as an agent of T & C Trust?
A. Well, no one really requested it. I just—I just did it on my own.
Q. And did T & C Trust exist before you did it on your own?
A. Yes.

Q. Mexico City? And do you send it to the attention of anybody in Mexico City?

A. Dr. Delgado.

Q. And how does he—what's his relation—You have a name involved with T & C Trust now, do you not? How do you spell that, please?

A. D-e-l-g-a-d-o, I believe.

Q. How did you meet Dr. Delgado?

A. I don't recall how I met him.

Q. When did you last see him?

A. Oh, I don't recall that.

Q. When did you first see him?

A. I don't know that. I've known him for a while.

Q. And how do you send money to him?

A. Just a money order.

Q. And is there anybody else, any other name that you have associated with T & C Trust besides Dr. Delgado?

A. That's the only one I'm aware of.

Q. Why didn't you testify earlier this morning and save us a little time, as to Dr. Delgado? [7]

Q. And how did you find out about T & C Trust?
A. I don't recall how I met them. I've done business with T & C Trust and business with various ones around, so I don't recall.
Q. Who is "them" that you met with T & C Trust?
A. T & C Trust, I just—I have done some business with T & C Trust. I've done business with different ones around. I don't recall how I met them; perhaps through an advertisement or something.
Q. Who is "them" that is involved with T & C Trust that you met?
A. I—I don't recall, Steve.
Q. You don't recall their names?
A. No.
Q. Are you certain that there's nobody in your family involved in T & C Trust?
A. There's no one in my family involved in T & C Trust.

A. I didn't recall the name.

Q. And what is Dr. Delgado's first name?

A. I don't know.

Q. Do you have any writings from Dr. Delgado?

A. No, sir.

Q. Do you have any agreements in writing from Dr. Delgado?

A. No, sir.

Q. What's your agreement with Dr. Delgado?

A. Oh, sometimes I will collect a note for him and forward the money.

Q. How much money do you get out of this transaction?

A. Sometimes 10 percent.

*See* Plaintiff's Exhibit 18, pp. 39–41.

However, at least one transaction that Debtor was involved in with T & C Trust can be analyzed in some detail on this record. Debtor and T & C Trust were apparently engaged in collecting on a judgment against Mr. and Mrs. Long (the "Long Judgment"), which judgment had been abstracted against certain real property owned by the Longs. The Longs filed for bankruptcy (the "Long Bankruptcy") in this Court. Debtor, individually, filed a notice of appearance dated October 9, 2000 in the Long Bankruptcy, claiming to be a creditor of the Longs. *See* Plaintiff's Exhibit 7, p. 000104. A few days

later (October 20, 2000), Debtor, again acting in his individual capacity, sent a letter to counsel for the Longs stating how his lien claim should be treated in the Longs' chapter 13 plan. *See id.* at p. 000106. At about this same time (October 18, 2000), Debtor signed and filed a proof of claim in the Long Bankruptcy as trustee for T & C Trust.[8] *See id.* at pp. 000045–46. A few days later (November 13, 2000), Debtor filed a Motion to Lift the Automatic Stay to foreclose his liens in connection with the Long Judgment in which he referred to himself as a creditor with no reference to T & C Trust. *See id.* at pp. 000013–16. On December 4, 2000, Debtor, as trustee for T & C Trust, assigned the Long Judgment and liens to himself, individually. *See id.* at p. 000087. On the same day, Debtor executed a note in the amount of $5,000.00 payable to T & C Trust (at Debtor's P.O. Box in Cedar Hill, Texas), *see id.* at p. 000093, and granted T & C Trust a security interest in the Long Judgment and liens and agreed to "pay all proceeds collected from the judgment debt and lien to the secured party [T & C Trust] up to an amount equal to $5,000.00 plus any accrued interest." *See id.* at pp. 000089–92. As noted previously, Debtor's note to T & C Trust was payable at Debtor's own P.O. Box and Debtor's brother, Norris DeVoll, signed at the bottom of Debtor's note as Trustee for T & C Trust.[9] *See id.* at p. 000093.

---

Q. Is your brother involved in T & C Trust?
A. Not that I know of.
*See* Plaintiff's Exhibit 18, pp. 27–29.

**8.** Recall that Plaintiff filed a motion to dismiss Debtor's then pending chapter 11 case on September 7, 2000. *See* p. 85, *supra.* Debtor responded to this motion and requested that the Court convert the case to a chapter 7 case instead of dismissing it. *See id.* The case was converted to one under chapter 7 by Order entered on November 13, 2000. *See id.* Debtor's interest in the Long Note was not disclosed in any document filed in his

bankruptcy case. Interestingly, the assignment documents were signed after Debtor's case was converted to chapter 7.

**9.** At his reconvened section 341 meeting, Debtor had testified that no family member had an interest in or was related to T & C Trust. *See* Plaintiff's Exhibit 18, p. 29. In addition, Debtor testified that he had done no transactions involving T & C Trust after he filed bankruptcy. *See id.* at p. 30. When specifically asked if he was being "forthright and fully honest today," Debtor answered "[y]es, sir." *See id.* at p. 31. Of course, that

### 4. Mortgage Investment Trust

Debtor testified that Mortgage Investment Trust is one of the trade names under which he does business. *See* Plaintiff's Exhibit 18, p. 17. Debtor did not disclose this trade name, or d/b/a name, in any of his schedules or statements of financial affairs. *See* Plaintiff's Exhibits 3–5.

### 5. Cadle Company (Texas)

Debtor is the registered agent for, and the secretary of, a Texas corporation called Cadle Company ("Cadle Company (Texas)").[10] *See* Plaintiff's Exhibit 18, p. 18; *see also* Plaintiff's Exhibit 9. Debtor testified that he incorporated Cadle Company (Texas) with cash he received from Randy Dawson, but that Cadle Company (Texas) had not issued any shares of stock, had not held any meetings, had no other officers, and had no assets. *See* Plaintiff's Exhibit 18, pp. 19, 21, 23, 24; Plaintiff's Exhibit 17, p. 9. Debtor did not disclose his relationship or involvement with Cadle Company (Texas) in any of his schedules or statements of financial affairs. *See* Plaintiff's Exhibits 3–5.

Debtor scheduled an asset in this case relating to a judgment against Aubrey Brothers (the "Brothers Judgment"). *See* Plaintiff's Exhibit 3, Schedule B, answer to question 15. At his reconvened section 341 meeting, Debtor testified that he was "involved in that [judgment] with the Cadle Company."[11] *See* Plaintiff's Exhibit 18, p. 26. Although the Brothers Judgment was scheduled, any interest of the "Cadle Company" in that judgment was not disclosed—Debtor scheduled the Brothers Judgment as if it belonged to him individually.

Although Debtor testified at his reconvened section 341 meeting that he was the secretary of a corporation called the Cadle Company of Ohio ("Cadle Company (Ohio)"), his schedules and statements did not disclose that relationship. *See* Plaintiff's Exhibit 18, p. 22; *see also* Plaintiff's Exhibits 3–5. Debtor further testified that he had "some business dealings with the Cadle Company in Ohio" and that those dealings "involve notes, accounts receivable, judgments, debts." *See* Plaintiff's Exhibit 18, p. 25. Again, Debtor's schedules and statements did not disclose any such business dealings.

Jeffrey Joseph, an account officer for Cadle Company (Ohio), disputed Debtor's statements and testified that Cadle Company (Ohio) did not do business with Debtor. *See* Plaintiff's Exhibit 21. Specifically, Joseph testified that he "would not say we did business together with Gene DeVoll. He was an adverse party. We had to sue him personally. We also had to file suit to allow our claim in a probate matter, which he was named as the administrator. The case was styled the Estate of Aubrey Brothers ... We had to fight Mr. DeVoll on many of his mistruths he filed with the court ... It was a very long battle to defend ourselves against the lies and inaccurate statements of Mr. DeVoll, which [sic] I have come to know him as a very deceitful person." *See id.* at pp. 4–5. Ap-

---

was not true because Debtor's actions in the Long Bankruptcy were all done after Debtor filed his bankruptcy case and written documents evidence the fact that his brother served as "trustee" for T & C Trust.

**10.** Cadle Company (Texas) has no relation to the Cadle Company of Ohio, and Debtor was not authorized to use the "Cadle" name in

Texas by the Cadle Company of Ohio. *See* Plaintiff's Exhibit 21, p. 6.

**11.** Debtor did not specify which Cadle Company was "involved with" the Brothers Judgment. Since Debtor testified that Cadle Company (Texas) had no assets, the Court assumes Debtor meant Cadle Company (Ohio).

parently the court presiding over this dispute agreed with Cadle Company (Ohio) because the court granted Cadle Company (Ohio) a final summary judgment against Debtor for its attorneys' fees and court costs in connection with its attempts to collect its judgment against Aubrey Brothers. *See id.*, attachment 7. When asked if Cadle Company (Ohio) had authorized Debtor to charter Cadle Company (Texas), Joseph testified that "[n]ever would we now or ever would we want to do business with this man. My opinion is that he cannot be trusted." *See id.* at p. 5.

### 6. Joe Keresztury Homes, Inc.

Debtor disclosed in his statement of financial affairs that he had made payments to Joe Keresztury Homes, Inc. ("J.K. Homes") during the one year prior to his bankruptcy filing, that he still owed J.K. Homes $27,500.00, and that his brother "is a stockholder in J.K. Homes." *See* Exhibit 3, answer to question 3. The debt to J.K. Homes was apparently secured by a lien on real property owned by Debtor at 2813 Llano Circle in Fort Worth. When asked about this property at his reconvened section 341 meeting, Debtor testified that this property had been "returned to the creditor [J.K. Homes] under the [chapter] 13 case." *See* Plaintiff's Exhibit 18, p. 4. No motion was filed to approve that transfer, *see id.;* and thus, no order was signed by the Court. When asked about his brother's involvement with J.K. Homes at that time, Debtor testified that "[h]e is—he has some involvement, but I don't know what...." *See id.* Debtor later testified

that the only person he dealt with at J.K. Homes was his brother, Norris DeVoll. *See id.* at pp. 10–11.

Debtor had previously testified at an earlier section 341 meeting that he didn't pay off the first lien to J.K. Homes because "he couldn't afford to," *see* Plaintiff's Exhibit 17 (September 6, 2000 meeting), p. 7, and that he "deeded the house to Joe Cresery Homes [sic] in lieu of foreclosure." *See id.* However, Debtor paid the $410.00 monthly payment to J.K. Homes in June 2000, *see* Plaintiff's Exhibit 13 (June Operating Report), and in August 2000, *see id.* (August Operating Report).[12] Since Debtor testified on September 6, 2000 that this property had already been deeded to J.K. Homes in lieu of foreclosure, the Court concludes that such unauthorized, voluntary action must have occurred after the August payment was made.[13] Although Debtor contends that this property is now owned by J.K. Homes, Debtor further testified that he collects the rent, forwards the rent to J.K. Homes, and gets "10 percent for service and managing for Joe Cresery [sic]." *See id.* at p. 8.

### 7. Other

While he was a debtor in possession, Debtor sold the Ricky West judgment to a bank, (whose name he could not recall) for around $4,700.00. *See* Plaintiff's Exhibit 17, pp. 19–20. Debtor claims to have deposited that money in the DIP account. Given the state of Debtor's records, it is not possible to tell if Debtor ever deposited this money in the DIP account. *See* fn. 6, *supra.*

---

**12.** No other operating reports were admitted into evidence.

**13.** Why would Debtor voluntarily surrender real property to a company in which his brother was a shareholder when Debtor has continued to make the monthly payments on this property since his bankruptcy filing? A

cynic might infer a relationship between those payments and the upcoming conversion of Debtor's case to one under chapter 7. The asset would be gone—to his brother's company—and Debtor would have fees for "servicing" the property that are *his* rather than the *estate's*.

In June 2000, while a debtor in possession, Debtor was "involved" with a judgment against Efrem Guadian (the "Guadian Judgment"). *See* Plaintiff's Exhibit 17, pp. 17–22. At his reconvened section 341 meeting held on September 6, 2000, Debtor initially could not recall any of the details of this transaction. *See id.* Finally, Debtor testified that "maybe" he collected payments on the Guadian judgment for T & C Trust "but I don't recall." *See id.* at 20. A few lines of testimony later, Debtor testified that he did not "believe he [his brother] had any role in the Guadian deal at all." *See id.* But immediately thereafter, Debtor admitted that his brother was trustee under the mortgage— "[p]robably, he's the trustee." *See id.* At his reconvened section 341 meeting in December 2000, Debtor denied having ever been in business with his brother. *See* Plaintiff's Exhibit 18, p. 5.

### D. The Complaint

Plaintiff filed the Complaint on June 29, 2000, seeking to have the Judgment excepted from the Debtor's discharge pursuant to sections 523(a)(2) and (a)(6) of the Bankruptcy Code or, alternatively, to deny the Debtor a discharge pursuant to section 727(a).[14] *See* Complaint to Determine Dischargeability of Debt and to Deny Debtor a Discharge. Following the conversion of Debtor's case to one under chapter 7, Plaintiff filed a second adversary proceeding on February 15, 2001 seeking the same relief. *See* Complaint to Determine Dischargeability of Debt and to Deny Debtor a Discharge [filed as Adversary No. 01–4020]. The two adversary proceedings were consolidated into the instant proceeding for trial pursuant to an Order entered

on May 9, 2001. *See* Order Consolidating Duplicate Adversarial Cases.

In the Complaint, Plaintiff contends that the Judgment is non-dischargeable under 11 U.S.C. § 523(a)(6) because it evidences and establishes a willful and malicious injury (*i.e.,* a willful and malicious conversion) of Plaintiff's property. Plaintiff further contends that Debtor should be denied a discharge pursuant to section 11 U.S.C. § 727(a) because Debtor: (i) with intent to hinder, delay, or defraud a creditor has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, property of the debtor within one year before the date of the filing of the petition, or, property of the estate after the date of the filing of the petition, in violation of section 727(a)(2); (ii) concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which the debtor's financial condition or business transactions might be ascertained, in violation of section 727(a)(3); (iii) knowingly and fraudulently made a false oath or account in or in connection with the bankruptcy case, in violation of section 727(a)(4)(A); and/or (iv) failed to explain satisfactorily any loss of assets or deficiency of assets, in violation of section 727(a)(5).

As an initial matter, Debtor contends that the Complaint was not filed within 60 days of Debtor's first section 341 meeting, and that the Complaint is therefore untimely. Moreover, Debtor contends that the Judgment does not establish the necessary elements to except it from discharge. Specifically, Debtor contends that the Judgment does not establish that he committed a willful and malicious injury to Plaintiff's person or property. Debtor also

---

**14.** At trial, Plaintiff abandoned the allegations made under section 523(a)(2), relying solely

on those made under section 523(a)(6).

denies having violated any of the provisions of section 727(a) that would prevent him from receiving a discharge.

## II. LEGAL ANALYSIS

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding. *See* 28 U.S.C. §§ 157(b)(I) and (J).

### A. Timeliness of the Adversary Complaint

██ Debtor contends that the Complaint was not timely filed because it was not filed within 60 days of Debtor's first section 341 meeting. Bankruptcy Rule 4007(b) provides that "[a] complaint other than under § 523(c) may be filed at any time." *See* FED R. BANKR.P. 4007(b). Bankruptcy Rule 4004(a) provides that "[i]n a chapter 7 liquidation case a complaint objecting to the debtor's discharge under § 727(a) of the Code shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a). In a chapter 11 reorganization case, the complaint shall be filed no later than the first date set for the hearing on confirmation." *See* FED R. BANKR.P. 4004(a). However, Bankruptcy Rule 1019(2) provides that when a chapter 11, chapter 12, or chapter 13 case has been converted or reconverted to a chapter 7 case, "[a] new time period for filing claims, a complaint objecting to discharge, or a complaint to obtain a determination of dischargeability of any debt shall commence pursuant to Rules 3002, 4004, or 4007, provided that a new time period shall not commence if a chapter 7 case had been converted to a chapter 11, 12, or 13 case and thereafter reconverted to a chapter 7 case and the time for filing claims, a complaint objecting to discharge, or a complaint to obtain a determination of the dischargeability of any debt, or any extension thereof, expired in the original chapter 7 case." FED R. BANKR.P. 1019(2).

Debtor initially filed this case under chapter 11. Debtor then converted this case to one under chapter 13, re-converted it to one under chapter 11, and finally converted it to one under chapter 7 on November 13, 2000. While his case was pending under chapter 11, Debtor never obtained a setting on confirmation of a plan of reorganization. Pursuant to Bankruptcy Rule 1019(2), the conversion of Debtor's case to one under chapter 7 resulted in the establishment of a new deadline for filing objections to discharge. *See* FED R. BANKR.P. 1019(2). The section 341 meeting in Debtor's converted chapter 7 case was originally scheduled for December 18, 2000. *See* Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines. Thus, pursuant to Bankruptcy Rule 4004(a), the deadline to file the Complaint did not expire until 60 days after December 18, 2000, or February 16, 2001. *See* FED R. BANKR.P. 4004(a).

Plaintiff filed the Complaint on June 29, 2000.[15] It was timely filed.

### B. Dischargeability of the Judgment

#### 1. Standard under Section 523(a)(6)

██ Plaintiff alleges that the Judgment is non-dischargeable under 11 U.S.C. § 523(a)(6) because it evidences a willful and malicious injury (*i.e.*, conversion) of Plaintiff's property. Plaintiff bears the burden of proving that the Judgment is non-dischargeable by a preponderance of the evidence. *See Everspring Enterprises, Inc. v. Wang (In re Wang)*, 247 B.R. 211,

---

15. The duplicate complaint was filed on February 15, 2001. *See* p. 92, *supra.* It was also timely.

213–14 (Bankr.E.D.Tex.2000) ("The standard of proof for allegations under § 523, like that of allegations brought under § 727, is by a preponderance of the evidence.") (citing *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) and *In re Townsley*, 195 B.R. 54 (Bankr. E.D.Tex.1996)); *FDIC v. Smith (In re Smith)*, 160 B.R. 549, 552 (N.D.Tex.1993), *aff'd*, 39 F.3d 320 (5th Cir.1994) ("The 'standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard.' ").

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." *See* 11 U.S.C. § 523(a)(6). Therefore, to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. *See Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480, 486 (5th Cir.1986) ("An individual is not entitled to a discharge from any debt 'for willful and malicious injury by the debtor to another entity or to the property of another entity.' "); *In re Smith*, 160 B.R. at 552–53 ("Section 523(a)(6) is an exception to the right of discharge contained in the Bankruptcy Code. It precludes the discharge of a debtor 'from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity.' ") (citations omitted).

■ In this context, "willful" means intentional and "malicious" means without just cause or excuse. *See Chrysler Credit Corp.*, 783 F.2d at 486 ("An individual is not entitled to a discharge from any debt 'for willful and malicious injury by the debtor to another entity or to the property of another entity.' 'Willful' means intentional and 'malicious' means without just cause or excuse."); *Bombardier Capital*

*Inc. v. Black (In re Black)*, 179 B.R. 509, 515–16 (Bankr.E.D.Tex.1995) (" 'Willful,' as used in section 523(a)(6), means deliberate or intentional. 'Malicious,' as used, means in conscious disregard of one's duties, or without just cause or excuse, and does not require ill will or specific intent to do harm.") (citations omitted).

■ A specific intent to injure is not a necessary element to satisfy the willful and malicious standard. *See In re Smith*, 160 B.R. at 552–53 ("To be 'malicious' the act must be done in conscious disregard of one's duties, or without just cause or excuse, but does not require ill will or specific intent to do harm.") (citations omitted). Conduct which is merely negligent or reckless does *not* constitute willful and malicious conduct and therefore does not fall within the section 523(a)(6) exception to discharge. *See Kawaauhau v. Geiger*, 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) ("We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6).").

### 2. Dischargeability of the Judgment

In the Conversion Lawsuit, the jury found that Debtor "converted the personal property of the plaintiff, in a manner which was the proximate cause of damages to the plaintiff." *See* Plaintiff's Exhibit 1, Question No. 1. The jury also found that the "conduct of the [Debtor] in converting plaintiff's property, [was] done willfully, maliciously, or with reckless disregard to the rights of the plaintiff." *See id.*, Question No. 3. Plaintiff contends that either of these findings, standing alone, cause the Judgment to be excepted from discharge under section 523(a)(6).

In light of Plaintiff's contentions and these jury findings, the Court must decide two questions: (i) does the act of conver-

sion, standing alone, satisfy the willful and malicious standard of section 523(a)(6); and (ii) does the exemplary damage finding—that the conversion was willful, malicious, or reckless—satisfy the willful and malicious standard of section 523(a)(6).

### a. Conversion alone

■ In Texas, "conversion" is defined as "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex.1992) (quoting *Tripp Village Joint Venture v. MBank Lincoln Centre, N.A.*, 774 S.W.2d 746, 750 (Tex.App.—Dallas 1989, writ denied)). To establish conversion, a plaintiff must prove that: (i) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (ii) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (iii) the defendant refused the plaintiff's demand for the return of the property. *See Huffmeyer v. Mann*, 49 S.W.3d 554 (Tex.App.—Corpus Christi 2001). Intent to convert is not an essential element; the defendant need only do an act amounting to a conversion. *See Revie v. Smith (In re Moody)*, 899 F.2d 383, 385 (5th Cir.1990) (citing *McVea v. Verkins*, 587 S.W.2d 526, 531 (Tex.Civ. App.—Corpus Christi 1979, no writ) ("[A] good faith but unauthorized retention of property can be a conversion.") and *Geders v. Aircraft Engine & Accessory Co.*, 599 S.W.2d 646, 651 (Tex.Civ.App.—Dallas 1980, no writ)).

■ In determining whether an award of exemplary damages is appropriate incident to a jury finding of conversion (as opposed to a separate finding for exemplary damages), Texas courts have concluded that malice can be implied where the conversion was willful and knowing. Specifically, Texas courts have implied malice where the conversion was willful, or where the act of conversion was done knowingly, intentionally, deliberately, or designedly. *See, e.g., Annesley v. Tricentrol Oil Trading, Inc.*, 841 S.W.2d 908, 910 (Tex.App.— Hous. [14th Dist.] 1992, writ denied), *abrogated on other grounds by Van Allen v. Blackledge*, 35 S.W.3d 61 (Tex.App.— Hous. [14th Dist.] 2000) (affirming an award of exemplary damages for a conversion where "[t]he jury specifically found that Touchstone's conversion of the seats was 'intentional,' as was his breach of fiduciary duty. In such a case, malice may be implied"); *First Nat. Bank of McAllen v. Brown*, 644 S.W.2d 808, 810 (Tex.App.— Corpus Christi 1982, writ refused n.r.e.) ("In a case where there is a wilful [sic] and knowing conversion under circumstances showing a lack of good faith, malice may be implied. Also, in cases where the defendant knew or should have known that it had no legal right to repossession, ill will or malice may be implied from the knowing conversion of another's property without a legal right thereto.") (citations omitted); *Geders v. Aircraft Engine and Accessory Co., Inc.*, 599 S.W.2d 646, 650 (Tex.Civ.App.—Dallas 1980) ("Appellants also attack the issue and the sufficiency of the evidence relating to exemplary damages. They argue that exemplary damages can be obtained only when defendants have acted with malice. The issue here required only that the jury find that appellants' conversion of the engine was 'willful,' which was defined as an act done 'knowingly, intentionally, deliberately, or designedly.' We hold that this issue will support exemplary damages."); *cf. Gonzalez v. Hibernia Nat'l Bank*, No. 01–92– 02355–00, 1993 WL 265454, *2–3 (Tex.

App.—Dallas July 16, 1993, no writ)[16] ("The standard for exemplary damages in a conversion case does not require malice; the only requirement is 'a willful and knowing conversion under circumstances showing a lack of good faith' ... Malice may be implied in the case of a willful and knowing conversion where good faith is negated. Implied malice exists when wrongful conduct is intentional and without just cause or excuse. Where the defendant knew or should have known that it had no legal right to repossession, ill will or malice may be implied from the knowing conversion of another's property without a legal right thereto.") (citations omitted).

■ However, this does not mean that *any* finding of conversion compels a finding of malice, and therefore an exemplary damages award, because intent is not an element of the tort—*i.e.*, a conversion may nonetheless be made in good faith. *See McVea,* 587 S.W.2d at 531 ("[A] good faith but unauthorized retention of property can be a conversion."); *Geders,* 599 S.W.2d at 650–51 ("Appellants argue that under this construction any conversion would give rise to exemplary damages. We disagree because a conversion can be in good faith ... [K]nowledge [of the rights of the property's owner] is not necessary, because a good faith but unauthorized retention of property can be a conversion.").

The jury's first finding in the Conversion Lawsuit does not include a finding of a bad faith conversion, *see* Plaintiff's Exhibit 1, Question No. 1; nor does it find that the conversion was knowing, intentional, deliberate, or malicious.[17] *See id.* At most, the conversion was found to be "unlawful" or "wrongful." [18] *See id.* Because malice cannot be implied from a finding of a "wrongful" or "unlawful" conversion in Texas, the jury's first finding in the Conversion Lawsuit does not satisfy the requirements of section 523(a)(6) and the Court cannot find the Judgment to be excepted from discharge.

**b. Conversion plus exemplary damages**

■ Exemplary damages were awarded in the Conversion Lawsuit based upon the jury's finding that the "conduct of the [Debtor] in converting plaintiff's property, [was] done willfully, maliciously, *or* with reckless disregard to the rights of the plaintiff." *See* Plaintiff's Exhibit 1, Question No. 3 (emphasis added). Question No. 3 to the jury was constructed using the disjunctive "or," and there is no evidence in the record before this Court that indicates which construction the jury gave to the disjunctive alternatives—*e.g.*, that the jury found that the conversion was done: willfully, maliciously, *and* with reckless disregard; *only* willfully; *only* maliciously; *only* with reckless disregard; *only* willfully and maliciously; etc.

If the Court could determine from the record before it that the jury had found

---

**16.** Although Texas Rule of Appellate Procedure 47.7 provides, *inter alia,* that "[o]pinions not designated for publication by the court of appeals have no precedential value," *see* TEX. R.APP. P. 47.7, the reasoning in the opinion, while not conclusive or binding, is nonetheless persuasive.

**17.** The jury answered "yes" to the question "[d]o you find that the defendant converted the personal property of the plaintiff, in a

manner that was a proximate cause of damages to the plaintiff?"

**18.** The jury was instructed that " '[c]onversion is the unlawful or wrongful exercise of the rights of possession, dominion, ownership or control by one person over the property of another to the exclusion of the exercise of such rights by the true owner of such property....' " *See* Plaintiff's Exhibit 1, Question No. 1.

that Debtor willfully and maliciously converted Plaintiff's property, the Court could conclude that the Judgment is non-dischargeable pursuant to section 523(a)(6). *See* 11 U.S.C. § 523(a)(6). Similarly, if the Court could determine on this record that the jury had found that the conversion was done only with reckless disregard, the Court would have to conclude that the Judgment is not excepted from discharge pursuant to section 526(a)(6). *See Kawaauhau,* 523 U.S. at 64, 118 S.Ct. 974 ("We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6).").

Because the Court cannot determine which of the possible alternatives the jury actually found, the Court cannot find that the requirements of section 523(a)(6) have been met here. Accordingly, the Court concludes that the Judgment is not excepted from discharge pursuant to section 523(a)(6).

## C. Denial of Debtor's Discharge

### 1. Standard under section 727 generally

Alternatively, the Complaint seeks a denial of Debtor's discharge under section 727(a)(2), (a)(3), (a)(4) and (a)(5). *See* Complaint; *see also* 11 U.S.C. § 727. Section 727(a) provides that the court shall grant a debtor a discharge, unless:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account;
. . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities; . . .

11 U.S.C. § 727(a)(2), (3), (4), and (5).

 Bankruptcy Rule 4005 places the burden of proof on the party objecting to the discharge. *See* FED. R. BANKR.P. 4005. Moreover, the section 727 exceptions are construed liberally in favor of the debtor and strictly against the creditor in furtherance of the "fresh start" policy of the Bankruptcy Code. *See In re Wang,* 247 B.R. at 214 (citing *In re Adlman,* 541 F.2d 999, 1003 (2nd Cir.1976)); *Cullen Center Bank & Trust v. Lightfoot (In re Lightfoot),* 152 B.R. 141, 146 (Bankr.S.D.Tex. 1993) ("All complaints objecting to discharge are strictly construed against creditors in order to effectuate the debtor's fresh start."). The standard of proof required is a preponderance of the evidence. *See In re Wang,* 247 B.R. at 214 (citing *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); *In re Lightfoot,* 152 B.R. at 146 ("[T]he United States Supreme Court held that the appropriate standard of proof in 11 U.S.C. § 523 matters is the preponderance of the evidence standard. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The rationale employed by the Supreme Court in *Grogan* applies as well in 11 U.S.C. § 727 proceedings.").

■ If any one ground for a denial of discharge is established, the Court does not need to decide the propriety of any of the other grounds. *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177 (5th Cir.1992); *In re Perez*, 954 F.2d 1026, 1027 (5th Cir.1992). Because the Court finds ample support for the denial of Debtor's discharge pursuant to section 727(a)(4)(A), it is not necessary to address Plaintiff's remaining contentions.

### 2. Section 727(a)(4)(A)

■ To deny Debtor's discharge under section 727(a)(4)(A), Plaintiff must prove, by a preponderance of the evidence, that: (i) Debtor made a statement under oath; (ii) the statement was false; (iii) Debtor knew the statement was false; (iv) Debtor made the statement with fraudulent intent; and (v) the statement related materially to the bankruptcy case. *See In re Beaubouef*, 966 F.2d 174, 177–78 (5th Cir.1992); 11 U.S.C. § 727(a)(4). False oaths sufficient to justify a denial of discharge include a false statement or omission in the debtor's schedules[19] and/or a false statement by the debtor at an examination of him during the case. *See id.*

■ The accuracy and completeness of information contained in a debtor's schedules and statement of financial affairs is essential to the successful administration of the case, *see In re Lightfoot*, 152 B.R. at 149, and any deliberate omissions may result in the denial of a discharge. *See id.* As the Fifth Circuit has noted, "[i]n determining whether an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors. The subject matter of a false oath is 'material,' and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Beaubouef*, 966 F.2d at 177. As noted by the Eleventh Circuit:

> The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. It makes no difference that he does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them. The veracity of the bankrupt's statements is essential to the successful administration of the Bankruptcy Act.

*In re Chalik*, 748 F.2d 616, 617 (11th Cir. 1984) (quoted in *In re Beaubouef*, 966 F.2d. at 178).

■ Debtor failed to disclose in his schedules and statement of financial affairs a wide variety of things, including a trade name under which he had done business, Mortgage Investment Trust, and his relationship or affiliation with several other entities, including Pennie Mac, Cadle Company (Texas), T & C Trust, and Lincoln Financial. Debtor also failed to disclose, or improperly described, certain of his assets, including his interest or involvement in the Long Judgment, the Lincoln Financial II Judgment, the Brothers Judgment, the Guadian Judgment, and the Wright Judgment. Debtor did not disclose the fact that he held cash assets for T & C

---

**19.** Bankruptcy Rule 1008 provides that "[a]ll petitions, lists, schedules, statements of financial affairs, [etc.] shall be verified or contain an unsworn declaration as provide in 28 U.S.C. § 1746." *See* FED. R. BANKR.P. 1008.

Trust and others. Debtor did not disclose the existence of certain agreements or contracts, executory or otherwise, in which he, or the estate, had a continuing interest, including the oral "servicing agreements" with T & C Trust and J.K. Homes.

Moreover, Debtor has repeatedly given sworn testimony that is inconsistent with other of his sworn testimony or is contradicted by other documentary evidence. *See* pp. 85–92, *supra.* Because the Debtor has told so many different stories (under oath) during this case, the Court finds most, if not all, of his testimony to be unreliable and not credible. Although set forth in some detail earlier in this opinion, to reiterate just a few of these inconsistencies in Debtor's sworn testimony here, the Court notes Debtor's conflicting testimony regarding (i) the existence of one or two entities called Lincoln Financial (*see* p. 87, *supra* ); (ii) whether or not Debtor's family, specifically his brother, had any interest in or relationship to T & C Trust (*see* p. 89, *supra* ); (iii) whether Debtor did business with his brother (*see* pp. 91, 91, 92, *supra* ); and (iv) whether Debtor had engaged in cash transactions during 2000 (*see* pp. 86, 87, 91, *supra* ).

Debtor contends that these errors or omissions were immaterial, because the value of the assets or interests was so nominal as to not warrant attention, or were the result of an innocent mistake. However, whether or not an omission is material is not merely a function of the value of the omitted assets or whether or not the omission was detrimental to creditors; "[t]he subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *See In re Beau-*bouef, 966 F.2d. at 178. Here, each of the errors and omissions related to Debtor's business transactions and/or the estate or would have assisted creditors in their efforts to understand Debtor's and/or the estate's assets and business dealings, and/or the existence and disposition of Debtor's property and/or estate property.

Debtor further contends that he was not required to disclose his interest or affiliation with several of the companies because they were not active companies, did no business, and/or had no assets. This contention is equally specious. Item 16 on the Statement of Financial Affairs calls for Debtor to "list names and addresses of all business in which the Debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the *two years* immediately preceding the commencement of this case...." *See* Plaintiff's Exhibits 3–5, Statements of Financial Affairs, Item 16. Item 16 is straightforward and calls for a straightforward answer. Item 16 cannot reasonably be interpreted to exclude dormant entities or entities which a debtor believes have no value or assets.

In light of the extensive omissions in Debtor's schedules and statements of financial affairs, and Debtor's repeatedly inconsistent sworn testimony, the Court concludes, at best, that Debtor has been recklessly indifferent to the truth. More likely, Debtor intended to frustrate his creditor's efforts to understand his many business relationships and ventures. There is no credible justification for Debtor's numerous false oaths or accounts in this case.

Because the Court finds (i) that Debtor made numerous false statements during this case under oath, both in his schedules and statements of financial affairs and in his sworn testimony, (ii) that Debtor knew

the statements were false when he made them, (iii) that Debtor made the statements with fraudulent intent, and (iv) that the false statements related materially to this case, the Court concludes that Debtor's discharge must be denied pursuant to section 727(a)(4)(A).

A judgment denying Debtor's discharge will be entered separately.